IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ANTHONY L. JONES,

                  Plaintiff,

  v.                                                                           OPINION and ORDER

JULIE LUDWIG, CANDACE WHITMAN,                                18-cv-907-jdp
and JAMES LABELLE,

                  Defendants.[1]

---

Plaintiff Anthony L. Jones, appearing pro se, is a prisoner at Fox Lake Correctional Institution (FLCI). Jones contends that defendant prison officials violated his Eighth Amendment rights by refusing to give him bottled water or test his blood for metals to prevent him from being harmed by contaminants in the prison's drinking water.

Defendants have filed a motion for summary judgment, Dkt. 34. I will grant that motion and dismiss the case because Jones fails to present evidence that defendants were personally involved in failing to prevent his medical problems or that his problems were caused by contaminants in the FLCI water.

UNDISPUTED FACTS

The following facts are undisputed unless otherwise noted. Both sides also refer to facts from this court's previous litigation about contaminants in the FLCI water; I have included some facts from my summary judgment decision in that case for background purposes. *See Stapleton v. Carr*, 438 F. Supp. 3d 925, 927 (W.D. Wis. 2020).

---

[1] I have amended the caption to reflect defendants' names as provided in their submissions.

Plaintiff Anthony Jones has been incarcerated at FLCI since July 30, 2014. Defendant Candance Whitman has been the health services manager at FLCI since July 2016. Defendant Julie Ludwig was a nurse at FLCI from March 2017 to September 2019. Defendant James LaBelle was employed by the DOC Bureau of Health Services as a regional nursing coordinator until he retired in February 2018.

Drinking water may contain at least small amounts of some contaminants. People often obtain part of their needed intake of copper from their drinking water, but exposure of elevated levels of copper can be hazardous to human health.

Lead is also hazardous to human health; according to the National Institute of Environmental Health Sciences, "No blood lead level is safe."[2] The United States Environmental Protection Agency (EPA) states that it "has set the maximum contaminant level goal for lead in drinking water at zero because lead is a toxic metal that can be harmful to human health even at low exposure levels. Lead is persistent, and it can bioaccumulate in the body over time."[3] But that zero-lead goal is not enforced by law. Drinking water regulations set by the EPA establishes "action limits," also known as "maximum contaminant levels," for metals including lead, copper, and arsenic.[4]

---

[2] National Institute of Environmental Health Sciences, *Lead*, https://www.niehs.nih.gov/health/topics/agents/lead/index.cfm.

[3] United States Environmental Protection Agency, *Basic Information about Lead in Drinking Water*, https://www.epa.gov/ground-water-and-drinking-water/basic-information-about-lead-drinking-water.

[4] The action level for lead is 15 parts per billion. The action level for copper is 1,300 parts per billion.

Several times between 2008 and 2013, water testing at FLCI showed lead and copper concentrations that exceeded the EPA's action level for those metals. In May 2014, the Department of Corrections entered into a consent order with the Wisconsin Department of Natural Resources (DNR) regarding the water quality at FLCI. Specifically, FLCI agreed to provide "public education" regarding the lead and copper action level exceedances, submit plans for cleaning, flushing, monitoring, and rehabilitation of the wells in the system, and obtain compliance with the lead and copper standards. In June 2015, a memorandum was posted in each housing unit stating that elevated levels of lead were found in the drinking water in some of the FLCI buildings, and that people with a variety of medical conditions, including high blood pressure, would be more susceptible to injury from the contaminated water.

The DOC took various efforts to remediate the contaminant problem, and in December 2016 the DNR "closed out" the consent order. From 2016 to the time of Jones's complaint, the lead and copper test results fell below the action levels, but they were not zero.

Jones has high blood pressure making him more susceptible to ill effects from contaminants and he believes that drinking the FLCI water has caused him medical problems. For instance, in late May 2017, Jones began suffering severe diarrhea causing him to become dehydrated and suffer constant sharp pain in his stomach. After a few days he was orders to take a stool sample and it showed that he tested positive for a bacterium called clostridium difficile. He was quarantined and given a course of antibiotics.

In early June 2017, Jones experienced severe nausea, vomiting, and dizziness. Jones was taken to the emergency room and later underwent tests showing that he had an abdominal neuroendocrine tumor. In late July 2017, the tumor was removed, leaving Jones with a large

3

scar "covering his entire stomach going up to the lower part of his chest." Dkt. 48, ¶ 46. Jones says that he hadn't had any medical problems related to his stomach until he arrived at FLCI.

Jones met with defendant Nurse Ludwig in mid-January 2018; Jones had an influenza-like illness, with coughing, sneezing, a runny nose, and chills. Ludwig examined Jones and told him to increase his fluid intake, rest, and take a decongestant. She also told him to report new or worsening symptoms. The parties dispute whether Jones mentioned that he was concerned about the FLCI water.

A couple weeks later, Jones filed a health service request asking to be tested for lead and radium. A non-defendant nurse responded, stating that FLCI doesn't test for lead and radium. Jones followed up with more health service requests, including one addressed to defendant Health Services Manager Whitman asking to be provided with bottled water, which inmates with certain medical problems are sometimes given. Medical staff triages health service requests, and Whitman did not review Jones's request herself. But she had previously told staff that the water was safe to drink based on meetings she had participated in in which she learned that the DNR was monitoring the water. A non-defendant nurse responded to Jones's request by stating that he could buy bottled water at the canteen and that the tap water was tested and safe.

In early March 2018, Jones filed an inmate grievance stating that the FLCI water was bad for his health, particularly given his high blood pressure, and asking for clean drinking water. The institution complaint examiner contacted defendant Whitman, who reviewed Jones's medical record and responded that no advanced care provider (such as a doctor or nurse practitioner) had ordered a blood test for metals, nor was there any indication that any of Jones's reported symptoms were linked to the FLCI drinking water. The examiner also

4

contacted Ludwig, who stated that there was no order by an advanced care provider to provide Jones with bottled water—nurses could not prescribe bottled water themselves—and that he could purchase water from the canteen. Jones states that nurses could order him bottled water, but the only evidence he has to support that is that a nurse once gave him Gatorade for dehydration. Jones's grievance was dismissed, with the examiner stating that there was no evidence that the water was unsafe.

Jones was seen by non-defendant advanced care providers in late March 2018 for follow up on the removal of his tumor and in early June 2018 for follow up regarding hypertension and asthma. The medical notes do not show that Jones asked for bottled water or for blood testing at these appointments, but Jones says that he did raise those issues.

In May 2019, Jones was hospitalized for fever, chills, and headache and was diagnosed with cellulitis in his right lower leg. Cellulitis is a bacterial skin infection that is most often caused by bacteria entering an open wound or defect in the skin.

I will discuss additional facts as they become relevant to the analysis.

ANALYSIS

I granted Jones leave to proceed on Eighth Amendment claims against defendants Ludwig, Whitman, and LaBelle for failing to provide him proper medical treatment in light of his increased risk of harm from the contaminated FLCI water, in particular refusing to give him other drinking water or test him for metals in his blood. Jones believes that his exposure to the water caused him to suffer a bacterial infection and develop a tumor in his abdomen.

The Eighth Amendment to the United States Constitution prohibits prison officials from consciously disregarding prisoners' serious medical needs. *Estelle v. Gamble*, 429 U.S. 97,

5

103–04 (1976). A "serious medical need" is a condition that a doctor has recognized as needing treatment or one for which the necessity of treatment would be obvious to a lay person. *Johnson v. Snyder*, 444 F.3d 579, 584–85 (7th Cir. 2006). A medical need is serious if it is life-threatening, carries risks of permanent serious impairment if left untreated, results in needless pain and suffering, significantly affects an individual's daily activities, *Gutierrez v. Peters*, 111 F.3d 1364, 1371–73 (7th Cir. 1997), or otherwise subjects the prisoner to a substantial risk of serious harm, *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). A defendant "consciously disregards" an inmate's need when the defendant knows of and disregards "an excessive risk to an inmate's health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Snipes v. Detella*, 95 F.3d 586, 590 (7th Cir. 1996). However, inadvertent error, negligence, gross negligence, and ordinary malpractice are not cruel and unusual punishment within the meaning of the Eighth Amendment. *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996).

To be liable for a constitutional claims like these brought under 42 U.S.C. § 1983, a defendant mut be personally involved in the constitutional violation. *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). Neither side submits facts suggesting that defendant LaBelle, who retired in February 2018, was involved in any of the events in question. As for defendants Ludwig and Whitman, Jones doesn't show that they were directly involved in refusing him bottled water or blood testing *before* he suffered the medical problems at the heart of his claims: a clostridium difficile infection and a neuroendocrine tumor. Instead, they were both involved after the fact by responding to the institution complaint examiner about Jones's grievance with statements that his medical record showed no documented link between his symptoms and the

FLCI drinking water, and that no advanced care provider had authorized bottled water or blood testing for him. This doesn't show that they disregarded Jones's needs before he suffered the harm that he believes was caused by the water. Nor does Jones provide any evidence suggesting that defendants hindered his treatment for the infection or tumor. Defendants' lack of personal involvement in the specific constitutional violations discussed in Jones's complaint would be enough reason for me to grant defendants summary judgment on his claims.

But that is not to suggest that Jones's claims suffer only from his failure to name the correct defendants who could have taken action before his infection or tumor, or his failure to add more claims regarding his later maladies discussed in the parties' proposed findings—a respiratory infection and cellulitis. The larger problem with Jones's allegations is that he provides no evidence suggesting that his medical problems were caused by the water at FLCI. He is not a medical professional, so he is "not competent to diagnose himself, and he has no right to choose his own treatment." *Lloyd v. Moats*, 721 F. App'x 490, 495 (7th Cir. 2017).

There are medical care cases where it is obvious to a lay person that a plaintiff is correct in blaming a particular cause for his injuries. That is not the case here. To the contrary, on the face of it there is no reason for a lay person to think that Jones's bacterial infections, tumor, or respiratory infection were caused by exposure to lead or other contaminants in the water. Jones would need an expert to make the link between the contaminants and his maladies.

In the past Jones has sought recruitment of counsel in part because expert testimony might be necessary to prove his claims. Jones has not renewed his motion for counsel on this issue, but if even he had, I would deny it. Given the dearth of willing counsel available to take pro bono cases, this court should not recruit counsel "if the plaintiff's 'chances of success are extremely slim.'" *Watts v. Kidman*, 42 F.4th 755, 766 (7th Cir. 2022) (quoting *Maclin v. Freake*,

7

650 F.2d 885, 887 (7th Cir. 1981). I consider it extremely unlikely that recruited counsel would be able to find an expert drawing a connection between the FLCI water and the seemingly unrelated medical problems that Jones had. And the court has already expended resources by appointing a medical and toxicology expert, Alfred Franzblau, to review the medical records of the numerous plaintiffs proceeding with their individual medical-care cases. *See Stapleton*, Case No. 16-cv-406-jdp, Dkt. 170 (W.D. Wis. Apr. 3, 2020). Franzblau's report does not support Jones's theory. Instead, Franzblau opines that it is unlikely that Jones suffered any acute or chronic toxic effects from the metals that Franzblau considered (arsenic, copper, lead, and manganese). And in particular, he stated that "it is unlikely that any of the 14 inmates [including Jones] has experienced any chronic symptoms or other chronic toxic effects (including cancer) from ingestion of lead in the drinking water at FLCI during the time period in question." Dkt. 33, at 13. He came to this conclusion in large part because "the risk of chronic toxic effects related to lead (such as high blood pressure or cancer) is generally related to cumulative (i.e., many years) or lifetime exposure to lead, and not brief episodes of over-exposure, such as those lasting for a few months, as in the situation at FLCI." *Id*. at 14.

The bottom line here is that Jones assumes that his medical problems were caused by contaminants in the FLCI water. But his mere speculation that the water caused his injuries is not enough to create a disputed issue of material fact making a trial necessary. *See, e.g., Herzog v. Graphic Packaging Int'l, Inc.*, 742 F.3d 802, 806 (7th Cir. 2014) (While nonmovant "is entitled . . . to all reasonable inferences in her favor, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." (citation omitted)). I will grant defendants' motion for summary judgment and dismiss the case.[5]

---

[5] Defendants also contend that they are entitled to qualified immunity on Jones's Eighth

8

ORDER

IT IS ORDERED that:

1. Defendants' motion for summary judgment, Dkt. 34, is GRANTED.

2. The clerk of court is directed to enter judgment accordingly and close this case.

Entered October 4, 2022.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge

---

Amendment claims. Because I am dismissing Jones's claims on the merits, I need not consider defendants' qualified immunity arguments.